IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON


ARDEN L. CURRIE,                          CV 04-532-BR

        Plaintiff,                        AMENDED
                                          OPINION AND ORDER
v.

JOANNE B. BARNHART, Commissioner,
Social Security Administration

        Defendant.


**KAREN STOLZBERG**
4370 N.E. Halsey Street
Portland, OR  97213
(503) 251-0707

        Attorney for Plaintiff

**KAREN J. IMMERGUT**
United States Attorney
**CRAIG J. CASEY**
Assistant United States Attorney
1000 S.W. Third Avenue
Suite 600
Portland, OR  97204-2902
(503) 727-1024


1 - AMENDED OPINION AND ORDER

**LUCILLE G. MEIS**
Office of the General Counsel
**RICHARD A. MORRIS**
Special Assistant United States Attorney
Social Security Administration
701 Fifth Avenue
Suite 2900 M/S 901
Seattle, WA  98104-2156
(206) 615-2165

    Attorneys for Defendant

**BROWN, Judge.**

    Plaintiff Arden Currie seeks judicial review of a final decision of the Commissioner of the Social Security Administration (SSA) in which she denied Currie's protective application for Disability Insurance Benefits (DIB) payments. Currie seeks an order reversing the decision of the Commissioner and remanding this action for an award of benefits.

    This Court has jurisdiction to review the Commissioner's decision pursuant to 42 U.S.C. § 405(g).  Following a thorough and careful review of the record, the Court **REVERSES** the decision of the Commissioner and **REMANDS** this matter pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this Opinion and Order.

## ADMINISTRATIVE HISTORY

    Currie filed his application for DIB on June 25, 2001.  The application was denied initially and on reconsideration.  An

Administrative Law Judge (ALJ) held a hearing on March 10, 2003.
At the hearing, Currie was represented by an attorney.  Currie;
William DeBolt, M.D., a medical expert; and a vocational expert
(VE) testified at the hearing.

The ALJ issued a decision on July 2, 2003, in which he found
Currie was not entitled to benefits.  That decision became the
final decision of the Commissioner on March 23, 2004, when the
Appeals Council denied Currie's request for review.

## BACKGROUND

### I.  Currie's Testimony

Currie was born on December 1, 1954, and was 48 years old at
the time of the hearing.  Tr. 72.[1]  He completed high school and
three years of college.  Tr. 119.  His past relevant work is
landscape contracting.  Tr. 122.

Currie testified he has serious pain and limitations in
using his right shoulder due to an injury in 2000 and
complications from his diabetes.  Tr. 459-60.  Currie testified
he cannot reach overhead with his right arm nor use it for any
activity for more than 20 minutes without pain or numbness.
Tr. 461.  The pain in his right shoulder prevents him from

---

[1] Citations to the official transcript of record filed with
the Commissioner's Answer on July 6, 2004, are referred to as
"Tr."

driving more than approximately ten miles without losing concentration.  Tr. 473.  Currie also testified he had less severe pain and stiffness in his left shoulder.  Tr. 462.

Currie also testified his diabetes was difficult to control. Tr. 466, 468.  When he has low or high glucose levels, it takes him "a couple of hours" to function again.  Tr. 466, 468.

Currie stated he has had numbness in his left foot for some time, and he also began experiencing numbness in his right foot during the year before the hearing.  Tr. 471.  He suffers from edema in his lower legs.  Tr. 471.  Currie testified he cannot stand or walk for more than 20-30 minutes without pain because of his feet.  Tr. 472.

Currie further testified he has trouble with night vision and peripheral vision due to a "slight stain" caused by retinopathy or leaking blood vessels in his left eye.  Tr. 475.

Currie testified fatigue has been "a big problem" for him for the last ten years.  Tr. 477-78.  He must sit or lie down after approximately 20-30 minutes of activity.  Tr. 477-78.  It takes about an hour of rest before he can resume any activity. Tr. 477-78.  Currie believes it is a combination of all of his health issues that cause the fatigue, but he is unsure of any particular reason for it becoming worse in the prior year.  Tr. 477-78.

Currie testified he usually gets up, reads the paper, checks

email, and makes breakfast.  Tr. 470-71.  At about 10:00 a.m., he takes a 45-minute rest.  Tr. 470-71.  After that rest, he usually goes to the store or to the library or does a household chore. Tr. 470-71.  He naps around 12:00.  Tr. 471.

## II.  Medical Evidence

Except when noted below, Currie does not challenge the ALJ's summary of the medical evidence.  Currie, however, contends the ALJ improperly rejected some medical evidence and failed to apply proper legal standards when he weighed the evidence and made his decision.

After carefully reviewing the medical records, this Court adopts the ALJ's summary of the medical evidence.  *See* Tr. 21-26.


### STANDARDS

A claimant is disabled if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  The initial burden of proof rests on the claimant to establish his disability. *Roberts v. Shalala*, 66 F.3d 179, 182 (9th Cir. 1995), *cert. denied*, 517 U.S. 1122 (1996).  The Commissioner bears the burden of developing the record.  *DeLorme v. Sullivan*, 924 F.2d 841, 849 (9th Cir. 1991).

The district court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record as a whole. 42 U.S.C. § 405(g). *See also Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995). "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Andrews*, 53 F.3d at 1039. The court must weigh all of the evidence whether it supports or detracts from the Commissioner's decision. *Martinez v. Heckler*, 807 F.2d 771, 772 (9th Cir. 1986). The Commissioner's decision must be upheld, however, even if "the evidence is susceptible to more than one rational interpretation." *Andrews*, 53 F.3d at 1039-40.

## DISABILITY ANALYSIS

### I.    The Regulatory Sequential Evaluation

The Commissioner has developed a five-step sequential inquiry to determine whether a claimant is disabled within the meaning of the Act. *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987). *See also* 20 C.F.R. § 416.920. Each step is potentially dispositive.

In Step One, the claimant is not disabled if the Commissioner determines the claimant is engaged in substantial gainful activity. *Yuckert*, 482 U.S. at 140. *See also* 20 C.F.R.

§ 416.920(b).

In Step Two, the claimant is not disabled if the Commissioner determines the claimant has no "medically severe impairment or combination of impairments." *Yuckert*, 482 U.S. at 140-41. *See also* 20 C.F.R. § 416.920(c).

In Step Three, the claimant is disabled if the Commissioner determines the claimant's impairments meet or equal "one of a number of listed impairments that the [Commissioner] acknowledges are so severe as to preclude substantial gainful activity." *Yuckert*, 482 U.S. at 140-41. *See also* 20 C.F.R. § 416.920(d). The criteria for the listed impairments, known as Listings, are enumerated in 20 C.F.R. pt. 404, subpt. P, app. 1 (Listing of Impairments).

If the Commissioner proceeds beyond Step Three, she must assess the claimant's residual functional capacity (RFC). The claimant's RFC is an assessment of the sustained, work-related activities the claimant can still do on a regular and continuing basis despite his limitations. 20 C.F.R. § 416.945(a). *See also* Social Security Ruling (SSR) 96-8p.

In Step Four, the claimant is not disabled if the Commissioner determines the claimant retains the RFC to perform work he has done in the past. *Yuckert*, 482 U.S. at 141-42. *See also* 20 C.F.R. § 416.920(e).

If the Commissioner reaches Step Five, she must determine

whether the claimant is able to do any other work that exists in the national economy. *Yuckert*, 482 U.S. at 141-42. *See also* 20 C.F.R. § 416.920(e), (f). Here the burden shifts to the Commissioner to show a significant number of jobs exist in the national economy that the claimant can do. *Yuckert*, 482 U.S. at 141-42. *See also Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999). The Commissioner may satisfy this burden through the testimony of a VE or by reference to the Medical-Vocational Guidelines set forth in the regulations at 20 C.F.R. pt. 404, subpt. P, app. 2. If the Commissioner meets this burden, the claimant is not disabled. 20 C.F.R. § 416.920(f)(1).

## II. The ALJ's Decision

Here the ALJ found Currie had not performed any substantial gainful activity since his alleged onset date of March 22, 2001. Tr. 20. The ALJ determined Currie has bilateral adhesive capsulitis and diabetes mellitus. Tr. 20. The ALJ, however, found these impairments do not meet or equal the listed impairments. Tr. 20.

The ALJ assessed Currie with the Residual Functional Capacity (RFC) for a limited range of sedentary exertion work. Tr. 21. The ALJ found the range of sedentary exertion work Currie could do was "narrowed by non-exertional limitations." Tr. 21. The ALJ concluded Currie could perform work as an eyeglass polisher or as a surveillance system monitor. Tr. 28.

<u>**DISCUSSION**</u>

Currie contends the ALJ erred when he: (1) failed to give legally sufficient reasons supported by the record for finding that Currie did not suffer from severe conditions of neuropathy, retinopathy, and nephropathy; (2) rejected Currie's subjective symptom testimony; (3) rejected the statements of Cathy Currie, Currie's wife, as to Currie's daily activities; (4) rejected the opinions of Currie's treating physicians; and (5) relied on an incomplete hypothetical to the VE.

## I.   The ALJ's Findings Regarding Conditions of Neuropathy, Retinopathy, and Nephropathy

Currie contends the ALJ erred when he failed to find Currie suffers from severe neuropathy, retinopathy, or nephropathy. Currie has the burden to establish the presence of medically determinable impairments and the severity of those impairments. *See Edlund v. Massanari*, 253 F.3d 1152, 1159-60 (9th Cir. 2001). "Severe" is generally defined as "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities." *Barnhart v. Thomas*, 540 U.S. 20, 24 (2003). The Commissioner does not address this contention in her Brief.

### A.   Neuropathy

At the hearing, Dr. DeBolt testified as a medical expert. He noted there was insufficient evidence in the record to

establish a diagnosis of neuropathy[2] because the records did not
show any testing of the sensation in Currie's feet nor any
testing of reflex at the ankle.  Tr. 479.  The ALJ noted the
evidence in the record only reflected an "unremarkable
examination of the left foot" on July 16, 2001, and "some foot
pain" that had "settled down" on February 25, 2002.  Tr. 213,
296.

Richard W. Bergstrom, M.D., a treating physician,
acknowledged this lack of evidence in an April 13, 2003, letter
to Currie's attorney.  Tr. 434-35.  In that letter, Dr. Bergstrom
states he assumed care of Currie in 1995.  Stephen Bookin, M.D.,
was Currie's treating physician at the time.  Tr. 434.
Dr. Bergstrom did not perform a complete neurological exam of
Currie because Dr. Bookin already had established a diagnosis of
diabetic neuropathy.  Tr. 434.  This record, however, does not
contain any treatment records from Dr. Bookin.

On September 17, 2003, two months after the ALJ issued his
decision, Paul R. Ash, M.D., Ph.D., a neurologist, performed an
evaluation of Currie's feet and ankles.  Tr. 449-50.  Dr. Ash
performed electrodiagnostic studies and concluded Currie had
"significant polyneuropathy" in his feet that could be attributed

---

[2] The on-line medical dictionary *medicinenet.com* defines
diabetic neuropathy as "A family of nerve disorders caused by
diabetes.  Diabetic neuropathies cause numbness and sometimes
pain and weakness in the hands, arms, feet, and legs."

to his diabetes. Tr. 450. Dr. Ash also found Currie had "normal bulk and normal strength in his hands." Tr. 449. Currie submitted this report to the Appeals Council. The Appeals Council found this additional evidence did not provide a basis for reversing or modifying the ALJ's decision, and it declined to review Currie's case.

When the Appeals Council considers materials not presented to the ALJ and concludes the materials do not provide a basis for altering the ALJ's decision, a reviewing court may consider the additional materials to determine whether there is substantial evidence to support the Commissioner's decision. *Harman*, 211 F.3d at 1180. *See also Ramirez v. Shalala*, 8 F.3d 1449, 1451-52 (9th Cir. 1993). This Court has reviewed Dr. Ash's post-hearing evaluation of Currie. Although Dr. Ash concludes Currie has "significant polyneuropathy," he does not make finding as to the extent to which this condition might limit Currie's life function. The Court, therefore, has no basis for determining whether Currie's condition is severe.

Accordingly, the Court concludes the Commissioner erred when she failed to fully develop the record after Dr. Ash's report concluding Currie had significant polyneuropathy was presented to the Appeals Council.

**B.  Retinopathy**[3]

The ALJ noted Currie has been treated by William J.

Prendergast, M.D., for proliferative diabetic retinopathy since

December 14, 1984, at which time Dr. Prendergast concluded Currie

had early, very mild, background diabetic retinopathy.  Tr. 423.

The ALJ further noted Dr. Prendergast's progress notes suggest

Currie's condition has remained stable in that there have not

been any reported significant changes or loss in his vision.

Tr. 338-425.  Currie concedes Dr. Prendergast does not report any

substantial losses in Currie's visual acuity.

Although the record demonstrates Currie has had several

laser surgeries on his eyes for minor hemorrhages, the Court

agrees with the ALJ that the record before the Court does not

support a finding that Currie's retinopathy has progressed beyond

an early or very mild condition as described by Dr. Prendergast.

Accordingly, the Court concludes the ALJ did not err when he

failed to find that Currie suffers from severe retinopathy.

**C.  Nephropathy**[4]

Currie states there is clear evidence that he has

nephropathy as demonstrated by the fact that his kidneys spill

───────────────

[3] *Taber's Cyclopedic Medical Dictionary* defines retinopathy
as "any disorder of the eye."  *Taber's Cyclopedic Medical
Dictionary* at R-39 (14th ed. 1981).

[4] *Taber's Cyclopedic Medical Dictionary* defines nephropathy
as "disease of the kidney."  *Taber's Cyclopedic Medical
Dictionary* at -12 (14th ed. 1981).

more protein into his urine than is normal.

With respect to nephropathy, Dr. DeBolt testified Currie's "BUN has never been - or creatinine[5] have not been substantially elevated. So, I think nephropathy has to be preceded by incipient or potential." Tr. 479. Relying on Dr. DeBolt's analysis and the entire record, the ALJ did not find Currie's nephropathy to be severe. The record does not reflect any diagnosis of elevated creatinine levels to suggest that Currie's nephropathy has gone beyond an incipient stage. The Court, therefore, finds the ALJ did not err in this decision.

Accordingly, the Court concludes the ALJ did not err when he failed to find Currie suffers from severe nephropathy.

## II.  The ALJ's Rejection of Plaintiff's Testimony

Currie alleges the ALJ erred when he failed to give clear and convincing reasons for rejecting Currie's testimony.

"If the ALJ finds that the claimant's testimony as to the severity of [the claimant's] pain and impairments is unreliable, the ALJ must make a credibility determination with findings sufficiently specific to permit the court to conclude the ALJ did not arbitrarily discredit claimant's testimony." *Thomas v. Barnhart,* 278 F.3d 947, 958 (9th Cir. 2002). When weighing the

---

[5] *Taber's Cyclopedic Medical Dictionary* defines creatinine as "one of the nonprotein constituents of blood and increased quantities of it are found in advanced stages of renal disease. It is a normal, alkaline constituent of urine and blood." *Taber's Cyclopedic Medical Dictionary* at C-127 (14th ed. 1981).

claimant's credibility, the ALJ may consider "inconsistencies either in his testimony or between his testimony and his conduct, his daily activities, his work record, and testimony from physicians and third parties concerning the nature, severity, and effect of the symptoms of which he complains." *Light v. Soc. Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997). "If the ALJ's credibility finding is supported by substantial evidence in the record, we may not engage in second-guessing." *Thomas,* 278 F.3d at 958.

The ALJ identified inconsistencies between Currie's testimony and the medical record and, as a result, found Currie's testimony regarding his ability to work was not credible. Tr. 21. For example, the ALJ noted Currie's wife, Cathy Currie, stated Currie frequently left home to go to the grocery store, the library, or the bank; to visit relatives; and occasionally to visit friends. Tr. 99-100. Cathy Currie also stated Currie gardens for short periods, gets exercise every day, fixes meals four times a week, does home maintenance once a week (with limitations), cares for a pet, and does other activities. Tr. 103-05. The ALJ concluded these statements show Currie "engages in normal activities of daily living," and his medication "does not significantly interfere with the activities to the extent that they allow him to be more active." Tr. 21.

The ALJ also considered the reports and examinations of Stephen Baugh, M.D., treating physician, and Dr. Bergstrom, who noted Currie's diabetes was stable and under good control. Tr. 237-38.  Dr. Prendergast's, whose progress notes also suggest Currie's retinopathy remained mild and stable.  Tr. 340-343. Gregory W. Irvine, M.D., treating physician, and Kip L. Kemple, M.D., treating physician, noted Currie's shoulder post-operation was making excellent progress, and Currie had only moderate shoulder restrictions.  Tr. 274, 259.  Finally, the ALJ noted Dr. Kemple reported in February 2002 that Currie had no findings of active inflammatory or neurologic issues with his feet. Tr. 262.

On this record, the Court finds the ALJ adequately explained why he found Currie's testimony concerning his physical limitations not credible.  The Court, therefore, concludes the ALJ did not err because he provided a legally sufficient basis supported by the record for rejecting portions of Currie's testimony.

**III. The ALJ's Rejection of Lay Testimony**

Currie contends the ALJ improperly rejected the lay statements of Currie's wife, Cathy Currie.  To reject lay witness testimony, the ALJ must give reasons that are germane to the witness.  *Nguyen v. Chater,* 100 F.3d 1462, 1467 (9th Cir. 1996). *See also Regennitter v. Comm'r,* 166 F.3d 1294, 1298 (9th Cir.

1999).

Although the ALJ relied on Cathy Currie's recitation of Currie's activities of daily living as a basis for rejecting Currie's assertions about his inability to work, Currie contends the ALJ ignored the generalized information in Cathy Currie's additional comments on the Third Party Information on Activities of Daily Living and Socialization questionnaire. Tr. 99-110. The record, however, reflects these more general statements are contradicted by Cathy Currie's more specific responses to questions regarding Currie's activities of daily living set out earlier in the form. The Court, therefore, finds the ALJ did not err when he rejected Cathy Currie's conclusions that contradicted her earlier statements.

**IV. The ALJ's Rejection of Opinions of Treating Physicians**

Currie contends the ALJ improperly rejected the opinions of Drs. Kemple, Bergstrom, and Baugh, Currie's treating physicians.

It is well-settled that "greater weight is afforded to the opinion of a treating physician than to that of [a] non-treating physician, because the treating physician is employed to cure and has a greater opportunity to know and observe the patient as an individual." *Ramirez v. Shalala*, 8 F.3d 1449, 1453 (9th Cir. 1993) (internal quotations omitted). A treating physician's opinion is controlling when it is "well-supported by medically

acceptable clinical and laboratory diagnostic techniques and is
not inconsistent" with other evidence of record.  20 C.F.R.
§ 404.1527(d)(2).  When a treating physician's opinion is not
entitled to controlling weight, the ALJ must give "specific,
legitimate reasons" for rejecting it if that opinion conflicts
with another physician's opinion or with evidence in the record.
*Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989).  When the
opinion of the treating physician or other medical expert is
uncontroverted, the ALJ must give "clear and convincing reasons"
before rejecting such an opinion.  *Id*.  *See also Lester v.
Chater*, 81 F.3d 821, 830-32 (9th Cir. 1995).

### A.   Dr. Kemple

Dr. Kemple, a rheumatologist, treated Currie for chronic
shoulder pain and other musculoskeletal problems.  Tr, 252-69,
286-96.  In March 2003, Dr. Kemple noted Currie reported
recurrent pain in his knees and foot, including problems with
numbness.  Tr. 426.  The ALJ noted Dr. Kemple's opinion that
Currie's physical capacity limitations are mainly related to
lifting restrictions and repetitive overhead arm use as well as
fatigue and general limitations on standing and walking.
Tr. 426.

Dr. Kemple also reported Currie showed modest improvement in
his ability to function after Currie was returned to a "baseline
analgesic schedule."  Tr. 426.  The ALJ did not find Dr. Kemple's

reports to be helpful because Dr. Kemple did not define the limitations of Currie's ability to function. Tr. 24, 426.

The ALJ also found Dr. Kemple failed to address Currie's specific limitations as to standing and walking. Tr. 24. The ALJ, however, considered Dr. Kemple's opinions when the ALJ determined Currie had an RFC for limited range of sedentary exertion, including limitations on lifting only up to ten pounds and avoiding repetitive overhead arm use. Tr. 24.

On this record, the Court finds the ALJ provided clear and convincing reasons for rejecting portions of Dr. Kemple's opinion; the ALJ properly considered the portions of Dr. Kemple's opinion that provide specific information as to Currie's limitations and health issues; and the ALJ weighed these limitations when he determined Currie was able to perform a limited range of sedentary work, including limitations on overhead arm use and lifting only ten pounds. Accordingly, the Court concludes the ALJ did not err when he rejected portions of Dr. Kemple's opinion because the ALJ gave legally sufficient reasons for doing so.

**B.    Dr. Bergstrom**

Currie alleges the ALJ improperly rejected Dr. Bergstrom's opinion and letter dated April 13, 2003. In the April 13, 2003, letter, Dr. Bergstrom, Currie's endocrinologist, opines Currie's variable blood glucose levels could cause "significant

psychological perturbations and can contribute to fatigue."
Tr. 435. Dr. Bergstrom notes the association of fatigue with the
duration and complication of diabetes has been the subject of a
number of studies, and he cites to an article on this topic.
Tr. 435.

Although the ALJ accepted Dr. Bergstrom's opinion, the ALJ
maintained his finding that Currie has an RFC for a limited range
of sedentary exertion adequately addresses the issue of fatigue.
The Court disagrees.

In his testimony, Currie stated he had to rest every two
hours. In his hypothetical to the VE and in his finding set out
in his opinion that Currie's complaints of fatigue were not
supported by the record, the ALJ, however, did not consider
Currie's need to rest. In light of Dr. Bergstrom's opinion of
April 13, 2003, regarding medical causes of fatigue, the ALJ was
required to develop the record regarding this possible limitation
on Currie's ability to perform work.

The Court, therefore, finds the ALJ erred when he failed to
adequately develop the record with regard to Dr. Bergstrom's
opinion as to Currie's fatigue.

**C.  Dr. Baugh**

Dr. Baugh, Currie's primary-care physician, completed a
Medical Source Statement of Ability to Do Work-Related Activities
on April 14, 2003.  Tr. 430-33.  Dr. Baugh opined Currie could

lift less than ten pounds occasionally, stand for two hours in an
eight-hour period, sit for less than six hours in an eight-hour
period, and was limited in pushing and pulling with upper
extremities.  Tr. 430-31.  In the Medical Source Statement,
Dr. Baugh stated Dr. Kemple could "better address" Currie's
limitations due to his musculoskeletal condition.  Tr. 431.

    The ALJ rejected Dr. Baugh's analysis of Currie's
limitations based on musculoskeletal condition because, as
Dr. Baugh stated in the Medical Source Statement, those issues
are outside his area of expertise.  Tr. 26.  The ALJ, however,
gave weight to portions of Dr. Kemple's opinion regarding
Currie's musculoskeletal condition.  Tr. 26.  The ALJ also
considered Dr. Baugh's diagnosis of diabetes and Currie's general
limitations of lifting, sitting, and standing.

    The Court, therefore, holds the ALJ did not err because he
gave legally sufficient reasons for rejecting Dr. Baugh's
opinions on Currie's musculoskeletal problems.

**V.    The ALJ's Hypothetical to Vocational Expert**

    Currie contends the ALJ's hypothetical to the VE was
incomplete and, therefore, invalid because the ALJ failed to
include Currie's limitations of pain and fatigue.

    The ALJ asked the VE whether Currie could perform his past
relevant work assuming a hypothetical person was limited to:
occasionally lifting 10 pounds; frequently lifting less than 10

pounds; standing or walking six hours in an eight-hour day; sitting six hours in an eight-hour day; pushing or pulling limited to the same weight as for lifting; avoiding ladders, ropes, or scaffolds; frequently climbing stairs or ramps; occasionally balancing, stooping, kneeling, crouching, and crawling; reaching overhead in a limited manner with both upper extremities; occasionally handling and fingering with upper right extremity; avoiding vibrations, hazardous machinery, and heights; and not driving a car for work. Tr. 492-93.

The VE opined such a person would not be able to perform Currie's past relevant work. Tr. 493. He testified, however, Currie could perform other work in the national economy as an eyeglass polisher or surveillance system monitor. Tr. 493-95. The VE also opined a person who missed one day or more of work per month for two months in a row could not maintain employment. Tr. 495. Finally, the VE opined a person who had to lie down at least three times a day for up to 30-45 minutes could not sustain employment. Tr. 495.

The VE testified Currie could perform work as an eyeglass polisher, but the VE could not advise how many of those positions were available in the national and local economies because "there are times when some of these numbers – there may be one or two or three other jobs that may be subsumed under one particular job." Tr. 497. The VE, however, stated most polisher jobs, other than

that of eyeglass polisher, required frequent to constant handling, fingering, and feeling, which are capabilities outside of the abilities of the hypothetical person.  Tr. 498.

The VE opined Currie could also perform work as a surveillance system monitor.  Tr. 495.  The VE, however, could not advise the ALJ as to how many of those jobs required responding to emergency situations by confronting the individuals who caused a disruption or emergency.  Tr. 503.  The VE conceded some surveillance system monitor jobs would require skills Currie did not have, and, in any event, the VE was unsure of the number of those jobs.  Tr. 503.

The Court finds the ALJ's hypothetical to the VE was appropriate at the time because Dr. Bergstrom's letter detailing the effects of variant glucose levels on energy and fatigue in diabetics was not presented until after the hearing before the ALJ.  The Court finds the ALJ erred, however, when he found Currie could perform relevant work as an eyeglass polisher and surveillance system monitor based on the VE's opinion as it was given.

In summary, the VE did not provide the ALJ with information as to whether the specific job of eyeglass polisher existed in significant numbers in the national economy.  The ALJ also conceded a portion of the job of eyeglass polisher would require abilities outside of the hypothetical person's limitations, and

the VE was unable to provide numbers for jobs that fit Currie's limitations.

Similarly, the VE could not provide information on the number of surveillance system monitor jobs in the national economy that would require Currie to respond to emergency situations, which Currie was not able to do. The Court, therefore, finds the VE's testimony was insufficient as a basis for the Commissioner's conclusion at Step Five that Currie could perform other jobs available in significant numbers in the economy.

Accordingly, the Court concludes the ALJ erred at Step Five because he did not provide a legally sufficient basis for finding Currie could perform other jobs that are available in significant numbers in the economy.

## VI.   Remand for Further Proceedings

The Ninth Circuit has established a three-part test "for determining when evidence should be credited and an immediate award of benefits directed." *Harman*, 211 F.3d at 1178. The court should grant an immediate award of benefits when:

> (1) the ALJ has failed to provide legally sufficient reasons for rejecting such evidence, (2) there are no outstanding issues that must be resolved before a determination of disability can be made, and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.

*Id.* The second and third prongs of the test often merge into a

single question:  Whether the ALJ would have to award benefits if the case were remanded for further proceedings.  *See id*. at 1178 n.2.

As noted, the Court finds the ALJ failed:  (1) to develop the record with regard to Plaintiff's possible medical sources of fatigue as noted in Dr. Bergstrom's opinion of April 13, 2003, and (2) to consider all of Plaintiff's limitations when determining whether Plaintiff could perform jobs that exist in significant numbers in the national economy.  The Court also concludes the Commissioner erred when she failed to fully develop the record after Dr. Ash's report concluding Currie had significant polyneuuropathy was presented to the Appeals Council. Because these determinations require further development of the record, it is not clear whether an award of benefits is appropriate.  Accordingly, the Court concludes remand of this matter for further proceedings is necessary.  *See Schneider v. Comm'r*, 223 F.3d 968 (9th Cir. 2000).  *See also Reddick v. Chater*, 157 F.3d 715, 729 (9th Cir. 1998)("We do not remand this case for further proceedings because it is clear from the administrative record that Claimant is entitled to benefits"); *Rodriguez v. Bowen*, 876 F.2d 759, 763 (9th Cir. 1989) (if remand for further proceedings would only delay the receipt of benefits, judgment for the claimant is appropriate).

Based on this record, the Court remands this matter to the

Commissioner for further proceedings.

## CONCLUSION

For these reasons, the Court **REVERSES** the decision of the Commissioner and **REMANDS** this matter pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this Opinion and Order.

IT IS SO ORDERED.

DATED this 18th day of April, 2005.


/s/ Anna J. Brown
_____
ANNA J. BROWN
United States District Judge



Currie Amended 04-532 O&O.04-18-05.wpd